IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LARRY J. McCLINSEY, SR.,           )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        )  Civil Action No. 08-23
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )

**MEMORANDUM OPINION**

**I.  INTRODUCTION**

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Larry J. McClinsey, Sr., and Defendant
Michael J. Astrue, Commissioner of Social Security. Plaintiff
seeks review of a final decision by the Commissioner denying his
claim for supplemental security income benefits ("SSI") under Title
XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the
reasons discussed below, Defendant's motion is denied, Plaintiff's
motion is granted in part and the case remanded to the Commissioner
for further consideration.

**II.  BACKGROUND**

A.  Factual Background

Larry J. McClinsey, Sr., was born on July 28, 1965, and
graduated from high school in Orlando, Florida, in 1983.
(Certified Copy of Transcript of Proceedings before the Social
Security Administration, Docket No. 6, "Tr.," at 469.) In 1990,
Mr. McClinsey completed training as a nurse's aide and emergency

medical technician (Tr. 62), but it appears he was never employed in either capacity. Between 1981 and 2000, Mr. McClinsey worked as a custodian in a Florida theme park, in various restaurant-related jobs (cook, host, and busboy), and as a maintenance worker in a cemetery. (Tr. 71.)

By the late 1990s, Plaintiff had already developed lower back pain and mental health problems, but continued to work. In August 2000, while working as a restaurant cook in DuBois, Pennsylvania, Mr. McClinsey slipped on ice in a walk-in freezer and exacerbated his chronic lower back pain. (Tr. 499, 470.) In August 2001, having moved back to Florida, Plaintiff began consulting with Dr. Oscar E. Piedad who noted "severe radiculopathy with L4-L5 disk herniation for which he cannot afford surgery;" Plaintiff was apparently unemployed at the time. (Tr. 186.) During the next year, Dr. Piedad treated Mr. McClinsey for back problems, chronic obstructive pulmonary disease, gastroesophageal reflux disease, asthma, hypertension, and chronic sinus infections. (Tr. 168-196.) On March 8, 2002, Dr. Piedad noted that Plaintiff needed a referral for a TENS unit,[1] a wheelchair, and "a mental health evaluation for co-dependency disorder with his wife." (Tr. 183.)

At Dr. Piedad's suggestion, Mr. McClinsey began consulting with a pain management specialist, Dr. Carlos Jassir, in September

---

[1]  A "TENS unit," or transcutaneous electrical nerve stimulator, is a device which sends electrical impulses to designated parts of the body to block pain signals. *See* entry at en.wikipedia.org (last visited December 11, 2008.)

2001. At the time, Plaintiff was being treated with darvocet for "moderate" pain; Dr. Jassir prescribed Vicodin ES[2] instead. (Tr. 155.) In November 2001, Plaintiff underwent a series of three lumbar epidural steroid injections to alleviate the pain from degenerative disc disease, lumbar disc displacement, and lumbar spondylolisthesis[3] at L4-L5. Following the third injection on November 15, 2001, after Plaintiff reported an inability to walk long distances, Dr. Jassir prescribed a light-weight wheelchair to supplement the cane Plaintiff was already using. He also suggested Plaintiff consider lumbar facet blocks to further treat his back pain which had improved only about 20% to 30% with the steroid injections. (Tr. 137-140.)

At an appointment on April 26, 2002, Dr. Jassir noted Plaintiff's complaints of headache, numbness in his legs, and pain

---

[2]   Darvocet (propoxyphene) is used to relieve mild to moderate pain. Vicodin is a combination product containing hydrocodone and acetaminophen, also used to relieve moderate to severe pain. Hydrocodone is in a class of medications called opiate analgesics which work by changing the way the brain and nervous system respond to pain. *See* drugs and supplements entry at the website maintained by the National Institutes of Medicine, www.nlm.nih.gov/medlineplus (last visited December 11, 2008), "Medline Plus."

[3]   Spondylolisthesis is a condition in which a vertebra in the lower part of the spine slips forward and onto a bone below it. The condition may be congenital, usually occurring between the fifth lumbar vertebra and the first bone in the sacrum.   In adults, the most common cause is degenerative disease, usually occurring between the fourth and fifth lumbar vertebrae, but it may be associated with stress fractures, traumatic fractures or other bone diseases. Symptoms may include lower back pain and pain in the thighs and buttocks, stiffness, muscle tightness, and tenderness in the spinal area.   Neurological damage may result from pressure on nerve roots and may cause pain radiating down the legs. *See* medical encyclopedia at Medline Plus.

3

in his foot, shoulders, back, and lower extremities. He commented, "Mr. McClinsey is not doing well. He is [complaining of] severe pain that is not responding to . . . conservative [treatment.]" He recommended that Dr. Piedad order an orthopedic consultation. (Tr. 130-131.) In October 2002, Mr. McClinsey fell and was treated at the emergency room at Osceola Regional Medical Center. X-rays and an MRI revealed mild to moderate degenerative disc disease at L4-5 and L5-S1 with generalized bulging of the annulus fibrosus but no significant herniated nucleus pulposus and no central canal or neural foraminal stenosis. A comparable study of the thoracic spine was normal as was a CT scan of the brain. (Tr. 156-161.)

Dr. Jassir's medical records end with an entry on December 13, 2002, at which time he was waiting for records from the orthopedic consultant in order to schedule a facet block at L5-S1. Plaintiff continued to treat with Dr. Piedad through July 2, 2003, when he noted that Mr. McClinsey had "significant [degenerative joint disease] problems with his lower back, and . . . some somatization disorder considering the fact that he is on multiple medications and has a lot of domestic anxiety and difficulties due to family members that have conditions as well." He noted Plaintiff benefitted from taking benzodiazepine (Xanax) for anxiety and muscle relaxation which Dr. Piedad had prescribed. (Tr. 169.) On July 29, 2003, apparently in connection with one of Plaintiff's

4

earlier applications for Social Security benefits,[4] Dr. Piedad wrote a general summary of Plaintiff's current medical conditions.[5] No medical records from Florida appear after this date.

Sometime in the late spring or early summer of 2004, Mr. McClinsey returned to DuBois and began treating with Dr. Phuong Wirths, a general practitioner. (Tr. 53.) Dr. Wirths's primary concern was the overwhelming number of medications Plaintiff had been prescribed and drug interactions which might be occurring.[6] (Tr. 272.) Plaintiff reported that as of May 28, 2004, he was using his wheelchair 70% to 80% of the time. In July 2004, Dr. Wirths provided a script for a replacement TENS unit and an electric wheelchair, commenting that because Plaintiff had "significant" arm pain, an electric wheelchair might improve his quality of life.

---

[4] The ALJ herein concluded Plaintiff had previously filed for Social Security benefits in 1993, 1999, 2001 and 2004, all of which had been denied at either the initial review stage or after a hearing before an ALJ. (Tr. 521.) He advised Plaintiff and his counsel at the hearing on June 13, 2007, that if benefits were awarded, they would begin as of the protective filing date for the application then under consideration, i.e., April 1, 2005. Plaintiff does not dispute this point in his brief in support of the motion for summary judgment.

[5] In this letter, Dr. Piedad also indicated Plaintiff had lost his medical benefits and was unable to follow through with prescribed physical therapy, referrals to an orthopodic surgeon for consultation about an injury to his right hand sustained in November 2002, nerve conduction studies, and other treatment.

[6] As of his first appointment with Dr. Wirths on May 28, 2004, Plaintiff listed his medications as prednisone, a nitro patch, flexeril, amitriptyline, prilosec, advair, procardia, ambien, temazepam, zoloft, vicodin, celebrex, xanax, albuterol nebulizer, laxis and medral dosepak. (Tr. 272.) At various times, Plaintiff was prescribed as many as 21 medications simultaneously. (*See*, e.g., Dr. Wilson's notes at Tr. 376.)

5

During the next several months, Mr. McClinsey consulted with a number of specialists, including Dr. P. Joseph Valigorsky, who provided a single steroid injection in his lower back, Dr. Angelo Illuzzi, a pulmonary specialist, Dr. Carroll P. Osgood, a neurologist, and Dr. John Ahn, a cardiologist. Dr. Wirths continued to try to wean Plaintiff from his numerous medications or at least to lower dosages because he believed some of Plaintiff's physical problems were the result of polypharmacy. However, every time the medications were reduced or discontinued, Plaintiff experienced increased pain, shortness of breath, increased anxiety, or other subjective complaints. (*See*, e.g., Tr. 259.) Although Dr. Wirths noted Plaintiff's generalized diagnoses of depression and anxiety and prescribed medication for those disorders, he did not order a psychological consultation or direct him to a mental health treatment facility.

B.    Procedural Background

On May 3, 2005, Mr. McClinsey filed his current application for supplemental security income benefits, alleging disability as of August 26 (or alternatively, November 10), 2000, due to back pain, heart problems, lung problems, hernias and ulcers. (Tr. 90-91.) The Social Security Administration ("SSA") advised Mr. McClinsey on November 10, 2005, that it had concluded that although he could not return to his previous job as a busboy, he could perform other work, despite his mental and physical limitations. (Tr. 41-45.)

6

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was initially scheduled for September 19, 2006, before Judge Douglas W. Abruzzo. This hearing was continued until March 1, 2007, in order for Plaintiff to provide additional medical records, particularly those related to his use of a wheelchair. The second hearing was continued again because Plaintiff was unable to attend. (Tr. 486-511, and 512-515, respectively.) Mr. McClinsey, who was represented by counsel throughout the process, eventually testified on June 13, 2007. Judge Abruzzo issued his decision on July 24, 2007, again denying benefits. (Tr. 13-24.) On December 4, 2007, the Social Security Appeals Council advised Mr. McClinsey that it had chosen not to review the ALJ's decision (Tr. 5-7), finding no reason under its rules to do so. Therefore, the July 24, 2007 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on January 29, 2008, seeking judicial review of the ALJ's decision.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the

plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the

8

decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[7] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000); 42 U.S.C. § 1382c(a)(3)(C)(I). The claimant must also show that his income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

In determining a claimant's rights to SSI,[8] the ALJ conducts

---

[7] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[8] The same test is used to determine disability for purposes of receiving either SSI or disability insurance benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts

9

a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[9] to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of

routinely consider case law developed under either program.

[9] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Fargnoli v. Halter, 247 F.3d 34, 40 (3d Cir. 2001). Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

10

performing work which is available in the national economy.[10]  Sykes
v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Abruzzo first
concluded that Mr. McClinsey had not engaged in substantial gainful
activity since the date on which he protectively filed the benefits
application under consideration, i.e., April 1, 2005.  (Tr. 15.)
In resolving step two, the ALJ found that as of the date of the
hearing, Mr. McClinsey suffered from degenerative disc disease of
the cervical and lumbar regions and a major depressive disorder,
both of which were "severe" impairments as that term is defined by
the SSA.[11]   (Id.)   He also noted that medical evidence showed
Plaintiff had mild pulmonary impairments, severe osteoporosis in
the lumbar spine, and cardiovascular problems; however, none of
these conditions resulted in more than a minimal effect on his
ability to perform basic work duties and therefore were considered
"non-severe."  (Tr. 15-16.)  Plaintiff also alleged problems with
both knees and ligament damage in his buttocks, but the ALJ found

[10]  Step three involves a conclusive presumption based on the
listings, therefore, neither party bears the burden of proof at that
stage.  Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S.
137, 146-147 n5 (1987).

[11]  *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b),
stating that an impairment is severe only if it significantly limits
the claimant's "physical ability to do basic work activities," i.e.,
"abilities and aptitudes necessary to do most jobs, including, for
example, walking, standing, sitting, lifting, pushing, pulling,
reaching, carrying or handling," as compared to "a slight abnormality"
which has such a minimal effect that it would not be expected to
interfere with the claimant's ability to work, regardless of his age,
education, or work experience.  Yuckert, 482 U.S. at 149-151.  The
claimant has the burden of showing that the impairment is severe.  Id.
at 146, n.5.

11

no medical evidence to support these conditions. (Tr. 16.)

At step three, the ALJ concluded neither of Plaintiff's impairments, considered singly or in combination, satisfied the criteria in the relevant Listings, i.e., Listing 1.04 (disorders of the spine) or Listing 12.04 (affective disorders). At step four, the ALJ concluded Plaintiff could

> perform medium work except that he must avoid ladders, ropes and scaffolds; for sedentary work only, must be afforded a sit/stand option that permits the claimant to take four or five steps away from his workstation during a one minute period up to five times an hour; must avoid unprotected heights, is limited to simple, routine tasks involving only simple, work-related decisions and is limited to occasional communication about the job with supervisors, co-workers and the general public.

(Tr. 17.)

The vocational expert ("VE") who testified at the hearing, Timothy E. Mahler, identified Plaintiff's past work as a fast food worker and restaurant host/greeter as light, semi-skilled work; busboy as medium, unskilled; restaurant cook as medium, skilled; and cemetery worker as heavy, semi-skilled. (Tr. 556-557.) The ALJ concluded that because of his non-exertional limitations, e.g., no more than occasional communication with supervisors, co-workers and the general public, Plaintiff could not return to any of those professions. However, the VE had identified several jobs readily available in the local or national economies which Plaintiff could perform despite the restrictions determined by the ALJ. These unskilled jobs included hand packer and material handler at the medium level, labeler/marker and laundry folder at the light level,

12

and surveillance system monitor, inspector, and addresser at the sedentary level. (Tr. 22-23; *see also* Tr. 558-559.) Therefore, based on his status as a younger individual[12] with at least a high school education and the ability to communicate in English, a work history which provided no transferable skills, Plaintiff's RFC, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Mr. McClinsey was not disabled and, consequently, not entitled to benefits. (Tr. 24.)

## B.   Plaintiff's Arguments

Mr. McClinsey raises four arguments in his brief in support of the motion for summary judgment. (Doc. No. 9, "Plf.'s Brief.") First, the ALJ abused his discretion in that the totality of the evidence supported an award of benefits. (Plf.'s Brief at 18-19.) We agree with Defendant that abuse of discretion is not the proper standard to be applied (*see* Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 15, at 20), and will not address this argument in more detail. Plaintiff next argues that given the significant body of supporting medical evidence, the ALJ erred as a matter of law by failing to give full weight to Plaintiff's statements regarding his symptoms, his physical limitations, and his ability to work. (Plf.'s Brief at 19-20.) Third, the ALJ erred as a matter of law by "minimizing the opinions

---

[12]   Plaintiff was 39 years old at the time of the application, and 41 at the June 2007 hearing, meaning he fell within the category defined as a "younger individual," i.e., less than age 50. 20 C.F.R. § 404.1563(c).

and conclusions of various medical experts," particularly the reports by Drs. Earl Taitt, William J. Fernan, Manish Sapra, Gaspar Santos, Garrett Dixon, and Shirish Shah. (Id. at 21-22.) Finally, the ALJ erred by failing to consider the cumulative effect of Plaintiff's numerous medical and psychological problems. (Id. at 22.) Because we agree with Plaintiff that the ALJ failed to explain the weight, if any, he gave to certain medical evidence, we need not address the second argument.[13] We interpret Plaintiff's fourth argument as pertaining to the hypothetical question posed to the Vocational Expert and will address that point briefly.

C.   Analysis

We approach this problem by considering the ALJ's determination of Plaintiff's physical and mental residual functional capacity at step four. In each instance, we find the

_____

[13]   We interpret Plaintiff's somewhat nebulous argument that the ALJ erred "by failing to give full weight" to Plaintiff's statements as a credibility argument. In most instances, a district court will give great deference to the ALJ's credibility determination because he or she is best equipped to judge the claimant's demeanor and attitude. See Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).   The determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001), quoting SSR 96-7p. This Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."   Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted.)   However, the reviewing court will reject an ALJ's credibility determination only if it is "patently wrong."   Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005).   Because we conclude the ALJ erred in evaluating the medical evidence, there is no reason to determine if his credibility analysis is closely linked to the record.

14

ALJ failed to discuss important evidence and explain his reasoning in that regard. Consequently, we find his analysis "beyond meaningful review" and are compelled to remand for further consideration.

        1.    *Plaintiff's Physical Residual Functional Capacity:* The first of two significant omissions in the ALJ's decision is a functional capacity evaluation ("FCE") conducted at the DuBois Regional Medical Center on September 1, 2004, at the request of Dr. Wirths. (Tr. 248-250.) This evaluation was composed of three parts. The first, a series of static strength tests, was performed three times to ensure consistency of effort. The tests revealed that Plaintiff's ability to lift weight using his arms,[14] as well as his ability to grip with either hand, was in the lowest 10th percentile of the "healthy industrial male population;" he was unable to perform some static strength tests at any level. The maximum effort test involved raising weights in a variety of positions, e.g., from floor to knuckles, from knuckles to shoulder, and from the shoulder overhead. The maximum weight Plaintiff was able to lift on this test was 2.5 pounds and again, some portions of the test, e.g., lifting weights from the floor and carrying objects 40 feet, could not be performed at all. The final part of the test involved postural efforts, e.g., sitting, bending,

---

[14]  Plaintiff was able to lift an average of 18 pounds on the three tests. This is in stark contrast to the ALJ's conclusion that he was able to perform medium level work which requires the ability to lift 50 pounds.

15

squatting, etc., most of which Mr. McClinsey was unable to do. The physical therapist conducting the examination concluded that Plaintiff could perform "less than sedentary" activities. He also stated, somewhat ambiguously,

> Symptom Magnification was attempted to be tested, however, due to patient's multiple areas of pain and complaints including shoulder, wrist, gluteal, etc., patient had multiple tender areas, pain with compression, pain with straight leg raise in both positions. I don't feel that the Symptom Magnification tests were very valid in this patient at this time.

(Tr. 250.)

The ALJ completely ignores this objective evidence in his decision, commenting that

> the totality of the evidence reflects numerous complaints from the claimant regarding his inability to work but there are very few severe [sic] objective findings in the record to support his allegations, as there are also serious inconsistencies on examination between different treating physicians. Therefore, these inconsistencies tend to support a finding that the claimant fails to perform at his full potential during these examinations in order to present himself to be more disabled than an untainted examination would reveal.

(Tr. 22.)

It would appear that the functional capacity evaluation offers exactly the type of "objective findings" on which the ALJ would properly rely. The Court has been unable to identify any other objective medical evidence which would refute the conclusion that Plaintiff was capable of "less than sedentary work," nor have we found any medical evidence to support the conclusion that Plaintiff deliberately performed at less than his full potential. In fact,

16

we could find *no* support for the ALJ's determination that Plaintiff could perform medium level work. No treating physician[15] such as Dr. Wirths was asked to opine on the question of Plaintiff's ability to work on a regular, ongoing basis, and none voluntarily offered such an opinion.

The first of three consulting physicians, Dr. Germain B. Calero, provided a report dated April 1, 2004, which did not

---

[15]   Social Security regulations identify three categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records.   20 C.F.R. § 404.1502.   Social Security regulations also carefully set out the manner in which medical opinions are to be evaluated.   20 C.F.R. § 404.1527(d).   In general, every medical opinion received is considered.   Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); *see also* Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (it is well-established that an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all.")   The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record."   20 C.F.R. § 404.1527(d)(2).   We recognize the physical therapist was not a treating source but the conclusion that Plaintiff could not perform even sedentary work is supported by acceptable clinical techniques.

17

explicitly state lifting, carrying, standing, walking or sitting limitations but did note that Mr. McClinsey (1) could hold "a small object weighing less than 5 lbs with either hand;" and (2) plainly had "some weakness of the lower extremities along with weakness in both knees," as evidenced by the fact that he came to the interview in a wheelchair and could "walk for less than 5 feet." Dr. Calero also opined that Plaintiff's functional ability was such that he was "not going to be able to have a position that requires a lot of physical activity or a position that requires a lot of walking."[16] (Tr. 222-225.) Dr. Shirish Shah, another one-time consulting physician, concluded in November 2004 that Plaintiff could lift up to ten pounds frequently and carry two or three pounds frequently, could stand and walk one hour a day, and could sit less than one hour a day. (Tr. 296.) Such a description is consistent with the FCE conclusion that Plaintiff could not perform even sedentary work, which requires the ability to stand or walk approximately two hours and to sit six hours per eight-hour work day. 20 C.F.R. § 404.1567. Dr. Garrett Dixon provided a third consultative report dated April 25, 2007 (Tr. 478-480), in which he concluded, following an extensive physical examination, that Plaintiff

> would be capable of functioning at least in the sedentary range as long as he could take breaks when needed for pain relief and could avoid repetitive bending, lifting, twisting and carrying. This appears to be consistent

---

[16] Dr. Calero further noted that because of his chronic depression, Mr. McClinsey "may have to avoid stressful situations." (Tr. 225.)

18

with the way he spends his day at home. He has a
longstanding history of mental illness and I think that
this has the most significant impact on his functioning
and his perception of his ability to perform functional
activities. This certainly also affects his tolerance
for pain and his coping skills.

(Tr. 480.)

One of the two non-examining state agency physicians concluded
in December 2004 that Plaintiff could lift and carry 20 pounds
occasionally and 10 pounds frequently and could stand, walk and sit
six hours a day, the requirements of light work as defined by the
Social Security Administration. (Tr. 299; *see also* 20 C.F.R.
§ 404.1567.) The other reviewer concluded on November 7, 2005,
that Mr. McClinsey could lift and carry 10 pounds occasionally and
"significantly less than 10 pounds" frequently; he could stand and
walk for no more than two hours a day and sit for six hours a day,
limitations consistent with sedentary work. (Tr. 347.)

In short, none of the medical evidence in the record supports
a determination that Plaintiff could perform medium level work
which requires lifting and carrying up to 50 pounds occasionally
and 25 pounds frequently as well as standing and walking "off and
on, for a total of approximately 6 hours in an 8-hour workday."
Social Security Ruling 83-10. It is reasonable to assume that if
the ALJ had considered the results of the FCE, along with the
conclusions of examining physicians Shah and Calero, he would have
arrived at the conclusion that Plaintiff was either disabled or, at

19

best, limited to some forms of sedentary work.[17]

Although we recognize that an ALJ need not refer to every relevant treatment note in the record, particularly when the medical evidence is as extensive as it is in this case (some 360 pages) (*see* Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001)), objective tests such as the FCE are particularly critical in

---

[17] In determining that Plaintiff could perform work which required the ability to intermittently stand and walk for six hours a day, it appears the ALJ concluded Mr. McClinsey did not need to use his wheelchair or cane. At the first hearing, the ALJ commented, "For example, you're sitting there in a wheelchair and the doctors that have looked at you say there's no reason for you to be in a wheelchair, so what's going on here?" (Tr. 500-501.) When Plaintiff attempted to explain that the wheelchair had been prescribed several years before but he could not remember the name of the physician, the ALJ questioned whether the physician whose name was on the script for the wheelchair had actually written it. The medical record shows that as noted above, Dr. Jassir prescribed the wheelchair in November 2001 and Dr. Wirths wrote a script for an electric wheelchair in July 2004, stating it would improve Plaintiff's quality of life. For reasons which are not clear in the record, Plaintiff was apparently unable to get an electric wheelchair at that time because when he was examined by Dr. Gaspar A. Santos on August 3, 2006, he was still using a non-motorized chair. Dr. Santos indicated on August 31, 2006, that a prescription should be written for a "medically necessary" motorized wheelchair or electric scooter. (Tr. 406, 404.) The only instance which might be interpret as support for the ALJ's reference to a doctor indicating that "there's no reason for [Plaintiff] to be in a wheelchair" was in a letter dated July 27, 2005, to Dr. Wirths from Dr. P. Joseph Valigorsky (who apparently saw Mr. McClinsey only on one occasion), stating, "He is in a wheelchair today and I asked him why. He states that his legs keep giving out and he has braces on both legs. There is no pathology to tell me why." (Tr. 274.) As noted by the ALJ, Dr. Wirths questioned whether Plaintiff's numerous braces were necessary, but we find no reference to the same question about his use of a wheelchair. Despite the fact that three treating physicians indicated over a period of five years that a wheelchair was required, the ALJ evidently substituted his own lay opinion on this question, a clear error of law. *See* Morales, 225 F.3d at 317 ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion") (internal quotation omitted.)

20

determining a claimant's residual functional capacity. When the ALJ fails to analyze or even allude to such information, the Court is unable to determine if it has been simply overlooked or rejected after consideration. *See* Burnett v. Commissioner, 220 F.3d 112, 121 (3d Cir. 2000) (an ALJ must "consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional determination.") Where such an analysis is missing, this court cannot perform the "meaningful review" required. *See* Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 93 (3d Cir. 2007), *citing* Burnett, id. at 119, for the principle that the "ALJ must provide a sufficient framework of reasoning for a court to conduct a 'meaningful judicial review' of the ALJ's decision."

2. *Plaintiff's Mental Residual Functional Capacity:* The second objective evidence not addressed by the ALJ was incorporated in a psychological evaluation performed by William J. Fernan, Ph.D., a licensed psychologist, on May 22, 2007. (Tr. 469-477.) In addition to conducting the usual mental status examination based in part on Mr. McClinsey's subjective reports and in part on the psychologist's own observations of Plaintiff's behavior during the interview, his responses to questions, abstract thinking, and concentration, Dr. Fernan administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"),[18] a recognized clinical tool

---

[18] The MMPI-2 is "the most widely used and widely researched test of adult psychopathology." It is used "by clinicians to assist with the diagnosis of mental disorders and the selection of appropriate treatment methods." *See* www.pearsonassessments.com/tests/mmpi_2.htm

used in personality assessment. Dr. Fernan concluded that despite a profile pattern which might seem to be of "somewhat questionable validity," the profile was in fact valid because it was "the result of [Plaintiff's] being extremely eccentric with strong subjective feelings of distress." According to Dr. Fernan, Mr. McClinsey's performance on the MMPI-2 indicated he

> is extremely lacking in self-esteem and confidence, very withdrawn and he experiences debilitating anxiety and depression. He harbors very strong feelings of anger and resentment and he would often be very agitated and impulsive, while being extremely egocentric and immature in general.  He would be extremely suspicious and distrusting and he would have great difficulty refraining from focusing on his many physical problems, while experiencing exacerbation of his somatic difficulties with any stress. However, significant physical problems were indicated and this process would not be under any conscious control.

(Tr. 473.)

Dr. Fernan's diagnoses included post-traumatic stress disorder, personality disorder, depressive disorder NOS, generalized anxiety disorder, panic disorder with agoraphobia, and personality disorder NOS (borderline, paranoid and schizotypal features.)   Plaintiff's GAF score[19] at the time was 45 and his

(last visited December 9, 2008.)

[19]   The Global Assessment of Functioning ("GAF") scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves.  Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF rating between 41 and 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)"  *See* the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF

prognosis was described as

> extremely poor, given the severity, long term nature and lack of response to treatment of his personal adjustment difficulties. Appropriate treatment would be seen as continued pharmacotherapy and individual psychotherapy. Participation in a partial hospitalization program could also be given significant consideration. Treatment would be seen as mainly for maintenance with little or no progress being seen.

(Tr. 474.)

The ALJ acknowledged Dr. Fernan's report but concluded it should be afforded "no more than slight weight, as his findings are inconsistent with the totality of the evidence." (Tr. 20.) At no point, however, does the ALJ (1) recognize that the conclusions therein are supported by objective evidence or (2) identify the evidence pertaining to Plaintiff's psychological condition which is inconsistent with Dr. Fernan's evaluation. Dr. Fernan's interpretation of the MMPI-2 profile indicating that Plaintiff "experiences debilitating anxiety and depression," would "often be very agitated and impulsive," and would experience "exacerbation of his somatic difficulties with any stress" would seem to directly support his later conclusions that Plaintiff would have marked or extreme difficulty carrying out short, simple instructions; understanding, remembering and carrying out detailed instructions;

---

MENTAL DISORDERS ("DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited December 9, 2008. Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score. *See* Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

making work-related decisions or judgments; and responding appropriately to any forms of supervision, interaction with co-workers, work-related pressures or changes in the work environment. (Tr. 446-447.)

Moreover, Dr. Fernan's conclusions are consistent with his own earlier report which had been conducted at the request of the Pennsylvania Bureau of Disability Determination and with many reports by other psychologists or psychiatrists who examined Mr. McClinsey.[20] These can be briefly summarized as follows:

•      Dr. Fernan's initial evaluation: The ALJ commented that in a report dated July 12, 2005, Dr. Fernan had noted Plaintiff's complaints of severe depression and his conclusion that Plaintiff would be severely restricted in his mental ability to perform work-related activities. (Tr. 20; *see also* Tr. 320-327.) However, he gave these findings little weight because they were "not supported by the objective findings on examination." While it is true Dr. Fernan did not administer a formal test as he did in May 2007, he reported his own objective observations such as Mr. McClinsey's failure to cooperate, his suspicious behavior (e.g., wanting to

---

[20] We omit the notes from a brief period of treatment between February and June 2006 by Dr. Luisito Dingcong in a "structured outpatient program" at a mental health center called Bright Horizons. In an initial assessment, Dr. Dingcong's physician's assistant noted Plaintiff's slow speech which was sometimes difficult to understand, poor memory, flat affect, some suicidal thoughts, and poor judgment. Although Dr. Dingcong diagnosed Mr. McClinsey with major depression, he provided no objective evidence in support of this opinion. Plaintiff was directed to participate in weekly group sessions, but apparently failed to do so after May 4, 2006, because his treatment plan was discontinued as of June 12, 2006.  (Tr. 369-374.)

record the interview), his "great difficulty initiating positive emotions," and his "extremely flat and depressed affect." Plaintiff failed to provide goal-directed answers; instead he rambled, provided excessive detail, or simply stared off, making it difficult for Dr. Fernan to regain his attention. His emotional expression was described as "appropriate to his thought content, but not to the situation." Dr. Fernan concluded, "The Mental Status Exam demonstrated very poor abstract thinking, attention and immediate memory, and extremely poor information, concentration, remote memory and test judgment."

• Dr. Earl Taitt: As the ALJ noted, Dr. Taitt performed a consultative examination on March 26, 2004, apparently in conjunction with one of Plaintiff's prior applications for Social Security benefits. The ALJ gave little weight to that report based on the fact that Dr. Taitt indicated that Plaintiff gave a "conflicted" medical history which was "internally inconsistent." In addition, his report relied on Plaintiff's "subjective complaints" and there was a "lack of objective findings." (Tr. 19.) Although Dr. Taitt did not conduct any objective tests comparable to the MMPI-2, his notes reflect that during the interview, Plaintiff's affect was reactive, his mood irritable, anxious and dysphoric; he was avoidant, with slow and inefficient thought processes; he refused to answer certain questions; his concentration was poor; he was easily distracted; he was forgetful with poor recall and poor retention; and his insight was limited.

25

(Tr. 220.) These observations by a board-certified psychiatrist are consistent with Dr. Fernan's objective findings. It is also unclear why Plaintiff's internally inconsistent medical history should affect the weight given to Dr. Taitt's conclusions.

• **Dr. Manish Sapra:** On November 28, 2006, Plaintiff began treatment at Clearfield Jefferson Mental Health Center where he was initially diagnosed with mood disorder NOS, delusional disorder, and possibly bi-polar disorder. His GAF at that point, as confirmed by Dr. Sapra, was 51, indicative of moderate psychological symptoms.[21] On March 8, 2007, Dr. Sapra completed a

---

[21] The ALJ gave little weight to the initial assessment, including the GAF rating, because it was not completed by a physician, had no supporting documentation, and was prior to the psychiatric evaluation by Dr. Sapra. (Tr. 21.) Judging by the scrawled signatures on the psychiatric evaluation known to have been written by Dr. Sapra and on the initial assessment, it appears that the psychiatrist "reviewed and approved" the latter. (See Tr. 465 and 466.) In Altman v. Comm'r of Soc. Sec., No. 04-1831, 2005 U.S. App. LEXIS 4162 (3d Cir. Mar. 10, 2005), the ALJ declined to give controlling or great weight to the opinions of physical and occupational therapists in a functional capacity evaluation report because, relying on 20 C.F.R. § 404.1513 and Social Security Ruling 96-2p, he correctly concluded such therapists were not considered "acceptable medical sources" for purposes of ascertaining the plaintiff's RFC. The Court of Appeals remanded the case for further consideration, in part because the report had been reviewed and signed by a medical doctor, an acceptable source, and the ALJ consequently should have given the opinion greater weight. Id. at *5-*6. By analogy, we believe the ALJ should have given more weight to the initial assessment by Dr. Sapra's assistant inasmuch as it was reviewed and approved by an acceptable medical source. See also Social Security Ruling 06-03p, "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Non-governmental Agencies," which recognized that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions

26

quite detailed psychiatric evaluation which reflected Plaintiff's ongoing failure to keep his appointments with the clinic nurse. In the mental status exam, Dr. Sapra noted Mr. McClinsey was alert and oriented times three; his speech was soft and monotonous; he demonstrated somewhat retarded psychomotor activity; his mood was sad; his affect was in the fair range; his thought processes were goal directed, linear and coherent; and his insight and situational judgment were fair. His GAF was estimated to be 65, indicative of mild symptoms or some difficulties in functioning. These are all observations by a trained physician rather than subjective reports. (Tr. 462-467.) The ALJ did not indicate what weight, if any, he gave to Dr. Sapra's March 2007 report. (Tr. 21.)

• <u>Dr. Peter W. Coffman:</u> Plaintiff referred himself to Dickinson Mental Health Center on March 28, 2007, at which time his mood was described as dysphoric, his affect appropriate, and his conversation "frequently tangential," requiring the interviewer to redirect him. His memory, concentration, and attention were "at best, fair." On a series of screening tests, Plaintiff subscribed to seven of eight items pertaining to depression. (Tr. 468.[22]) On

previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." (Emphasis added.)

[22] On remand, we suggest this initial evaluation be reviewed to determine if it is complete. It appears to end abruptly, with no discussion of a treatment plan, diagnoses, and other information typically found in such an assessment.

27

May 17, 2007, Dr. Coffman conducted an initial psychiatric evaluation which was largely consistent with those of other psychologists and psychiatrists. During the mental status exam, Dr. Coffman noted that although Mr. McClinsey was "essentially cooperative and appropriate" and became "somewhat more pleasant" during the course of the interview, his affect was constricted, at times he "almost appear[ed] to be sedated," and his speech was slowed. His thought process was described variously as goal directed, linear and "somewhat concrete;" at other times he displayed a "pronounced tendency towards being tangential and/or perseverative." Dr. Coffman commented that Plaintiff seemed to have "somewhat of an agenda of 'pleading his case.'" His attention and concentration were described as "somewhat impaired," his memory "questionable at best,"[23] his intellectual functioning in the average to low average range, insight and judgment appeared "to both be at best in [the] limited range, from a theoretical standpoint and may be more impaired in the functional realm." Dr. Coffman diagnosed Plaintiff with bi-polar disorder, recurrent, depressed, type I versus type II, with self-reported histories of panic disorder without agoraphobia and of post-traumatic stress disorder. He further noted that diagnoses of polysubstance abuse

_____

[23] At this point and others in his narrative, Dr. Coffman refers to medical reports of a Michael DeStefano. No information from that person, who apparently was a psychotherapist, appears in the record. On remand, it may be helpful for Plaintiff to provide those records or Mr. DeStefano's evaluation, if possible.

versus dependency, history of alcohol abuse, benzodiazepine dependency, and personality disorder NOS with narcisissitic and anti-social traits should be ruled out. Plaintiff's GAF at the time was rated at 50, reflecting serious symptoms or impairments in social and occupational functioning. Dr. Coffman did not provide any comments regarding Plaintiff's ability to perform work-related activities. (Tr. 481-485.) Again, the ALJ did not indicate the weight he gave to Dr. Coffman's evaluation. (Tr. 21.)

• State-agency file reviewers: Three psychologists or psychiatrists reviewed Plaintiff's mental health records in April and December 2004 and in September 2005. As the ALJ noted, these reviewers "were not afforded the opportunity to review the medical evidence received subsequent to their determinations." (Tr. 22.) In short, this means that two of their evaluations were based solely on the one-time consultative report of Dr. Taitt prepared more than three years before the hearing and the third on Dr. Taitt's report, the initial assessment by Dr. Fernan, and what seem to be Dr. Wirths's records.[24] The ALJ noted their conclusions that

_____

[24] This assumption is based on a reference in the September 2005 report to the fact that Dr. Wirths was "working to wean him from some of his psychotropics and other medications" and the fact that Plaintiff had been referred for pain treatment but not mental health treatment. (Tr. 344.) The Court has been unable to identify any physician's notes prior to that date indicating an attempt to reduce Plaintiff's psychotropic medications, but Dr. Wirths repeatedly tried to reduce the dosage of prednisone and recommended that he see Dr. Valigorsky for pain management. (See, e.g., Tr. 257 and 253.) Dr. Piedad recommended that Plaintiff consult Dr. Jassir for pain management in the August 2001 through July 2003 period, but since he also recommended mental health treatment (see Tr. 183), it is unlikely the state agency physician was referring to him.

29

although Plaintiff was markedly limited in his ability to understand, remember and carry out detailed instructions and interact appropriately with the general public, he was no more than moderately limited in the other abilities required to meet the basic mental demands of competitive work on a sustained basis. The ALJ properly noted that these reports were provided by non-examining physicians and were therefore entitled to less weight than those of a treating physician or an examining consultant. (Tr. 22.)

In summary, the record shows that Plaintiff was treated with psychotropic medications during the period for which records are provided, i.e., 2001 through 2007, but received little psychotherapy or other mental health treatment. Those physicians who commented on Plaintiff's depression, anxiety, and other disorders consistently described him as far more impaired than the ALJ found him to be. The ALJ afforded "little weight" to the evaluation by Dr. Taitt, Dr. Fernan's first report, and the therapist's report approved by Dr. Sapra. He gave "slight weight" to Dr. Fernan's second report and "some weight" to the reports of the state-agency reviewers, but failed to indicate how he regarded Dr. Sapra's second report or Dr. Coffman's evaluation. He does not indicate which, if any, of the psychological records he relied upon or whose evaluations supported his conclusion that Plaintiff's only restrictions were to "simple and routine tasks and simple work related decisions" and to "no more than occasional communications

about the job with supervisors, co-workers and the general public."
However, these limitations are consistent only with the opinions of
the non-examining state-agency physicians. This would imply that
contrary to his statement that such opinions were entitled to
little weight, those were the reports on which the ALJ actually
relied, in direct contradiction to the Social Security regulations
outlining how medical opinions are to be weighed. Conversely, Dr.
Fernan's second report, based on objective psychiatric evidence,
indicates much more severe restrictions, e.g., marked or extreme
difficulty carrying out even short, simple instructions; making any
work-related decisions or judgments; or responding appropriately to
any forms of supervision, interaction with co-workers, work-related
pressures or changes in the work environment. Had the ALJ given
Dr. Fernan's evaluation more than "slight" consideration, his
conclusion about Plaintiff's ability to perform work-related
activities on a regular basis could well have been different.
Inasmuch as the ALJ rejected Dr. Fernan's assessment as not
supported by objective findings and inconsistent with the totality
of the evidence, yet failed to acknowledge the MMPI-2 results or
identify the medical and other evidence on which he did rely, his
reasoning on this point is beyond meaningful judicial review.

　　　　3. *The Cumulative Effect of Plaintiff's Medical and
Psychological Problems:* It is well-established in this Circuit
that the hypothetical questions posed to a vocational expert in an
attempt to identify jobs which a claimant might perform despite his

limitations must describe in detail all of a claimant's impairments. *See* Ramirez v. Barnhart, 372 F.3d 546, 554-555 (3d Cir. 2004), *citing* Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (a "hypothetical question. . .must reflect all of a clamant's impairments"), and Burns v. Barnhart, 312 F.3d 113, 122 (3d Cir. 2002) ("great specificity" is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical question.) These limitations must include all conditions supported by the medical record, regardless of the ALJ's earlier determination as to their severity. *See* Burns, id. at 123, (the questions posed to the VE must include impairments supported by "medically undisputed evidence in the record"); *see also* Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999) (a proper hypothetical question is one which "fairly set[s] forth every credible limitation established by the physical evidence.")

As discussed above, the ALJ's hypothetical question to the Vocational Expert limited Plaintiff to simple, routine medium level work, simple work related decisions, and no more than occasional communication with supervisors, co-workers, and the general public. We have explained why we find these parameters may not have fully reflected Plaintiff's degree of impairment.

Further limitations in the hypothetical question posed by the ALJ included avoiding ropes, ladders and scaffolds, as well as a sit/stand/walk option for any sedentary occupations. (Tr. 557.) The medical record, however, reflects severe osteoporosis in the

32

lumbar spine, obesity, history of asthma and/or chronic obstructive pulmonary disease, and hypertension.[25] Taking Plaintiff's pulmonary problems as an example, the record is clear that throughout the relevant period, he was regularly treated for these conditions with medications such as Advair, Atrovent, and an Albuteral nebulizer. The hypothetical question included no environmental restrictions, even though they were recognized by a state-agency file reviewer who recommended that Plaintiff avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation as well as machinery and heights. (Tr. 349.) Nor does it incorporate Dr. Dixon's limitations regarding Plaintiff's inability to bend, lift, twist or carry, which are supported by the medical examination, e.g., range of motion studies. (Tr. 480.) Because no such limitations were incorporated in the hypothetical question, the Vocational Expert's identification of jobs which Plaintiff could perform despite his limitations is suspect.

## V. FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when

---

[25] Plaintiff also claimed his disability was due in part to hernias, ulcers and knee problems, but the Court has found no objective medical evidence in the file to support these conditions.

substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

As explained above, we have found the ALJ's analysis beyond meaningful review, primarily due to his failure to identify the medical evidence on which he relied for his conclusions and his failure to discuss objective evidence which points to the severity of Plaintiff's mental and physical impairments. If those explanations are provided, it may well be that the decision to deny benefits is supported by substantial evidence. *See* Plummer, 186 F.3d at 429 (where conflicting medical evidence is presented, "the ALJ may choose who to credit but cannot reject evidence for no reason or for the wrong reason," but must consider all the evidence and explain the reason(s) for rejecting any portion of it.) We therefore decline to award benefits and will remand for further consideration consistent with the reasoning herein.

An appropriate Order follows.

December __/₆__, 2008

*William J. Standish*

William L. Standish
United States District Judge

34